UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RHANA D. VEREEN, o/b/o R.D.R.,

                              Plaintiff,

        -against-                                                 5:05-CV-1298
                                                                  (LEK/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

### DECISION AND ORDER

## I.        BACKGROUND

### A.        Procedural History

Plaintiff Rhana D. Vereen ("Plaintiff") filed an application for Supplemental Security

Income ("SSI") on behalf of her minor son, RDR, on April 26, 2004.  Administrative Transcript

("AT") 49-51 (Dkt. No. 9).  The application was initially denied.  AT 25, 30-33.  A request was

made for a hearing.  AT 34.  A hearing was held before an Administrative Law Judge ("ALJ") on

November 2, 2004.  AT 249-62.  In a decision dated June 7, 2005, the ALJ found that RDR was not

disabled.  AT 13-23.  The Appeals Council denied Plaintiff's request for review on August 19,

2005.  AT 4-6.  Plaintiff, proceeding *pro se*, commenced this action on October 13, 2005 pursuant

to 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision.  Dkt. No. 1.

### B.        Contentions

Plaintiff disagrees with the ALJ's decision that RDR is not disabled.  Dkt. Nos. 1, 16.

Defendant argues that the Commissioner's determination is supported by substantial evidence in the

record, and must be affirmed.  Dkt. No. 12.

### C.        Facts

Plaintiff's son, RDR, was born in 2001.  AT 49, 66.  Plaintiff alleges that RDR is disabled

due to asthma, attention deficit hyperactivity disorder ("ADHD"), motor skill delays, and developmental delays.  AT 89.  Plaintiff alleges that RDR became disabled on August 1, 2001.  AT 49.

From August 14, 2001 to October 2, 2003, Plaintiff treated with Tahera Haq, M.D. of Syracuse Community Health Center.  AT 145-70.  Dr. Haq diagnosed Plaintiff as suffering from asthma and prescribed Xopenex.[1]  See id.  On October 2, 2003, Dr. Haq noted that Plaintiff's asthma is "stable."[2]  AT 146.

On January 1, 2002, RDR was treated at the emergency department of Upstate Medical University.  AT 126-29.  RDR was diagnosed as suffering from an upper respiratory infection.  Id. On January 27, 2002, RDR returned to the emergency room for treatment of reactive airways disease, and an upper respiratory infection.  AT 124-25.

On March 31, 2003, RDR underwent a consultative examination by Kalyani Ganesh, M.D. AT 192-95.  Dr. Ganesh diagnosed RDR as suffering from asthma and a history of hyperactivity. AT 195.  Dr. Ganesh concluded that RDR's physical development is normal and RDR's activities are age appropriate, but that RDR's speech is not intelligible.  Id.

On September 4, 2003, RDR underwent an evaluation by Loraine Graham, R.N. of the MLW Developmental Education Center.  AT 141-44.  Nurse Graham described RDR as "interactive" and "cooperative," but noted that RDR "appears to be struggling with his motor abilities.  He may also be exhibiting subtle differences in his receptive language abilities.  He is well connected with his mother and appears eager to try new tasks.  [RDR] is most content when engaged in problem[-]solving activities."  AT 143.

---

[1]  Xopenex is a bronchodilator.  The PDR Pocket Guide to Prescription Drugs 1559 (8th ed. 2008).

[2]  Dr. Haq also noted that testing showed that RDR's blood lead level is "borderline."  AT 147, 187.

On October 1, 2003, RDR was evaluated by Anne Collier, an occupational therapist.  AT 171-76.  Ms. Collier recommended that RDR receive occupational therapy services due to immaturities in sensory processing.  AT 175.

Also on October 1, 2003, RDR was evaluated by Tara Pienkowski, a special education teacher, and Wendy Dorfman, a physical therapist.  AT 177-82.  It was found that RDR qualifies for Early Intervention Services due to a delay in age-appropriate cognitive skills as well as "non-optimal performance overall" during behavioral testing.  AT 182.

On April 29, 2004, Lisa Acruw, an occupational therapist, and Diane Slowick, a special education teacher, recommended that RDR continue to receive occupational therapy due to his sensory impairments, and "special instruction" due to deficits in attention to tasks and processing verbal information.  AT 104.

However, on May 12, 2004, RDR was discharged from Special Education Services.  AT 114.  Ms. Slowick noted that RDR was "functioning at his age level in all areas."  Id.

On June 7, 2004, RDR underwent a second consultative examination by Dr. Ganesh.  AT 188-91.  Dr. Ganesh diagnosed RDR as suffering from asthma and a history of hyperactivity.  AT 191.  Dr. Ganesh concluded that RDR's physical development is normal; his speech is intelligible; and he is able to participate in age-appropriate activities.  Id.

Also on June 7, 2004, RDR underwent an evaluation by Dennis Noia, Ph.D., a psychologist.  AT 197-201.  Dr. Noia found that the results of the examination are consistent with some minor delays in adaptive functioning and low average intelligence.  AT 200.

On June 21, 2004, Manrique Quinto, M.D., an agency review physician, completed a Childhood Disability Evaluation Form.  AT 203-208.  Dr. Quinto indicated that RDR has a less than marked limitation in the functional domain of Health and Physical Well Being.  AT 206.  Dr.

Quinto found no other limitations.  AT 205-06.

On December 8, 2004, RDR underwent a speech/language evaluation by Jordia O'Connor, a speech/language therapist.  AT 231-32.  Ms. O'Connor found that RDR exhibits delays in receptive and expressive language skills.  AT 232.  Ms. O'Connor also found that the intelligibility of RDR's speech is decreased.  Id.

A Preschool Student Evaluation Summary Report dated December 9, 2004 indicates that RDR's cognitive skills are in the low average range; his socialization skills are an area of weakness; and he has fine motor delays, difficulty functioning in the classroom, and exhibits delays in receptive and expressive language skills.  AT 213-15.  It was recommended that RDR undergo occupational therapy.  AT 214.

On December 9, 2004, RDR was evaluated by various members of the Early Childhood Program of the Syracuse City School District.  AT 233-44.  It was found, *inter alia*, that RDR's overall cognitive skills are in the low average range; his behaviors are significant for attention problems; and he exhibits delays following multi-step directions.  AT 242-43.  It was recommended that RDR be designated as a "Preschooler with a Disability" and receive special language therapy, occupational therapy, and the services of a special education teacher.  AT 243-44.

On January 28, 2005, RDR was evaluated by Teresa Hargrave, M.D. of Syracuse Community Health Center.  AT 245-48.  Dr. Hargrave diagnosed RDR as suffering from learning disabilities in speech and sensory integration which are improved with intervention; "mother/child interaction issues exacerbated by mom's new pregnancy;" and reactive airway disease; and noted that RDR is "large for age with chronic tonsillar and adenoidal hypertrophy with probable obstructive sleep apnea contributing to behavioral problems and cognitive problems."  AT 247.  Dr.

Hargrave assigned RDR a score of eighty on the Global Assessment of Functioning ("GAF").[3]  AT 248.

An Individualized Education Program ("IEP") dated February 18, 2005 indicates that RDR is eligible for special services.  AT 211-12.  Specifically, RDR is eligible for special education services, occupational therapy, and speech/language services.  Id.

## II.  ADMINISTRATIVE LAW JUDGE'S DECISION

### A.  Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3),[4] the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and whether the correct legal standards have been applied.  See Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Urtz v. Callahan, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, inter alia, Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity.  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where

---

[3]  The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").  A score between 71 and 80 means that if symptoms are present, they are transient and expectable reactions to psycho-social stressors; there is no more than a slight impairment in social, occupational, or school functioning.  Id.

[4]  Section 1383(c)(3) makes section 405(g) applicable to the SSI program and provides the basis for this Court's jurisdiction and limitations of its review.

the weight of the evidence, however, does not meet the requirement for substantial evidence or a

reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's

decision may not be affirmed.  Johnson, 817 F.2d at 986.

###    B.    Determination of Childhood Disability

In 1996, Congress significantly altered the childhood disability terrain, for purposes of

eligibility for SSI benefits under the Social Security Act, by enacting the Personal Responsibility

and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat.

2105 (1996).[5]  In accordance with the PRWORA, which took effect on August 22, 1996, an

individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she

> has a medically determinable physical or mental impairment, which results in marked
> and severe functional limitations, and which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).  That definitional provision goes on to exclude from coverage any

"individual under the age of 18 who engages in substantial gainful activity. . . ."  42 U.S.C. §

1382c(a)(3)(C)(ii).  By regulation, the agency has prescribed a three-step evaluative process to be

employed in determining whether a child can meet the statutory definition of disability.  20 C.F.R. §

416.924; Kittles v. Barnhart, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); Ramos v. Barnhart, 02

Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).  The first step of the test, which

bears some similarity to the familiar, five-step analysis employed in adult disability cases, requires a

determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. §

416.924(b); Kittles, 245 F. Supp. 2d at 488.  If so, then both statutorily and by regulation the child is

ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

---

[5]  Entitlement to SSI benefits is governed by a federal program intended to provide benefits to needy aged,
blind, or disabled individuals who meet certain statutory income and resource limitations.  42 U.S.C. § 1381; see
Schweiker v. Wilson, 450 U.S. 221, 223, 101 S. Ct. 1074, 1077 (1981).

If the claimant has not engaged in substantial gainful activity, then the second step requires an examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are severe – that is, which causes more than a minimal functional limitation.  20 C.F.R. § 416.924(c); Kittles, 245 F. Supp. 2d at 488; Ramos, 2003 WL 21032012, at *7.  If the existence of a severe impairment is discerned, the agency must next determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings").  Id. Equivalence to a listing can be either medical or functional.  20 C.F.R. § 416.924(d); Kittles, 245 F. Supp. 2d at 488; Ramos, 2003 WL 21032012, at *7.  If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve month durational requirement is satisfied, the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1); Ramos, 2003 WL 21032012, at *8.

Under final regulations which became effective on January 2, 2001, and materially altered the test dictated under the superceded interim rules, see Kittles, 245 F. Supp. 2d at 488-89, analysis of functionality is informed by consideration of how a claimant functions in six areas which are denominated as "domains," and described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1); Ramos, 2003 WL 21032012, at *8. Those prescribed domains include:

> (i) [a]cquiring and using information;
> (ii) [a]ttending and completing tasks;
> (iii) [i]nteracting and relating with others;
> (iv) [m]oving about and manipulating objects;
> (v) [c]aring for [oneself]; and
> (vii) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation, defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate,

sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), is found in two of the listed

domains.  20 C.F.R. § 416.926a(a); Ramos, 2003 WL 21032012, at *8.  Functional equivalence also

exists in the event of a finding of an "extreme" limitation, meaning "more than marked,"

representing an impairment which "interferes very seriously with [the claimant's] ability to

independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(3)(i), in one

domain.  20 C.F.R. § 416.926a(a); Ramos, 2003 WL 21032012, at *8.

    **C.    ALJ Johnson's Findings**

        Using the three-step disability evaluation, ALJ Jon K. Johnson found that 1) RDR has not

engaged in any substantial gainful activity; 2) RDR has severe impairments; 3) RDR's impairments

do not meet, medically equal, or functionally equal any of the listed, presumptively disabling

conditions set forth in Appendix 1 of the Regulations.  AT 17-23.  The ALJ evaluated RDR's

functional abilities in the six domains established by 20 C.F.R. § 416.926a(b)(1) and found that

RDR has a marked limitation in only one domain of functioning.  AT 21.  The ALJ consequently

concluded that RDR was not disabled.  AT 22.

## III.    DISCUSSION

    **A.    Requests to Consider New Evidence**

        Plaintiff submitted numerous documents to the Court for the Court's consideration.  See

Dkt. Nos. 7, 14, 15, 16.  It appears that Plaintiff believes that this Court may consider the

submissions along with the evidence of record.  However, the Social Security Act does not permit

this type of consideration.  Instead, the Act provides that a court may remand a case to the

Commissioner to consider additional evidence, but only if the evidence is new, material, and there is

good cause for failure to incorporate that evidence into a prior proceeding.  42 U.S.C. § 405(g)

(sentence six).

The Second Circuit has developed a three-part test showing what is required to support a sentence six remand.  Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).  First, the evidence must be "new" and not merely cumulative of what is already in the record.  Id. (citing Szubak v. Secretary of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)).  Second, in order for the new evidence to be "material," it must be both relevant to the claimant's condition during the time period for which benefits were denied and probative."  Id. (citing Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975)).  The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently.  See Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991).  Third, the plaintiff must show that there is good cause for failing to present the evidence earlier.  Lisa v. Secretary of the Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (quoting Tirado, 842 F.2d at 597).

### 1.      First Submission - Docket Number 7

Plaintiff's first submission consists of seventy-two pages of documents relating to RDR's development.  Dkt. Nos. 7-2, 7-3, 7-4.  The majority of these documents are identical to documents already contained in the record.  See Dkt. No. 7-2 at pp. 3-8, 10-17, 20-25, 27-33; Dkt. No. 7-3 at pp. 7-16; Dkt. No. 7-4 at pp. 7-16.  Therefore, this evidence is not new as it is already contained in the record.  Accordingly, it does not serve as a basis for remand.

The remaining documents in Plaintiff's first submission are not contained in the record.  The Court will examine these in turn.

First, Plaintiff submitted a February 17, 2005 letter that is addressed to her from the Committee of Preschool Special Education.  Dkt. No. 7-2 at pp. 1-2, 18-19.  The letter is a form letter indicating that an IEP for RDR is enclosed.  See id.  The Court finds that this letter is

cumulative, as the IEP plan is already contained in the record; therefore the letter is not new.  See

AT 211-12.  Moreover, there is no reasonable possibility that the evidence would have influenced

the Commissioner to decide RDR's application differently, since the letter merely states that the IEP

is enclosed; therefore it is not material.  In light of the foregoing, this letter does not provide a basis

for remand.

Second, Plaintiff submitted a blank form titled Special Considerations/Test Modifications.

Dkt. No. 7-2 at pp. 9, 26.  This form is blank and contains no specific information pertaining to

RDR.  See id.  Therefore, the form is not material as it is not probative and there is no reasonable

possibility that the evidence would have influenced the Commissioner to decide RDR's application

differently.  The evidence does not provide a basis for remand.

Third, Plaintiff submitted forms describing RDR's dental health history, a nutritional

assessment, a prenatal/birth history form, a child development form, and medical provider

information.  Dkt. No. 7-2 at p. 34; Dkt. No. 7-3 at pp. 1-5.  The Court finds that these documents

are not material as they contain information that is not probative or is already contained in the

record.  Moreover, there is no reasonable possibility that the evidence would have influenced the

Commissioner to decide RDR's application differently.  Accordingly, these documents do not

provide a basis for remand.

Fourth, Plaintiff submitted a document completed by Dr. Haq, which describes RDR's

immunizations and the results of a physical examination performed on October 4, 2004.  Dkt. No. 7-

3 at p. 6.  The Court finds that this document is not material as it contains information that is not

probative or is already contained in the record.  Moreover, there is no reasonable possibility that the

evidence would have influenced the Commissioner to decide RDR's application differently.

Accordingly, this document does not provide a basis for remand.

### 2.      Second Submission - Docket Number 15

Plaintiff's second submission consists of three forms titled NICHQ Vanderbilt Assessment Scale. Dkt. No. 15. One form appears to be completed by Plaintiff while the remaining forms appear to be completed by RDR's teachers. Id. The form completed by Plaintiff is dated October 2, 2007. Dkt. No. 15 at at pp. 1-2. The forms by RDR's teachers are dated October 2, 2007 and October 16, 2007. Id. at pp. 3-6.

The fact that a document was generated after the ALJ rendered his decision does not necessarily mean that it has no bearing on the time period in question. Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004). In Pollard, the Second Circuit stated that even evidence relevant to a claimant's condition after the expiration of insured status may be relevant if it discloses the severity and continuity of impairments that existed previously. Id.; see also Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 644 (2d Cir. 2007) (citing Pollard, 377 F.3d at 193 for the proposition that evidence generated after an ALJ's decision could not be deemed irrelevant solely because of timing). Here, the forms in question do not clearly disclose the severity *and* continuity of impairments that existed previously. Instead, the forms simply reflect ratings of RDR's symptoms and performances in various areas within the previous six months. Accordingly, this evidence provides no basis for remand.

### 3.      Third Submission - Docket Number 16

Plaintiff's third submission consists of forms in which Dr. Haq requests that Plaintiff be administered certain medication during the school day. Dkt. No. 16 at pp. 6-7. Dr. Haq indicated that RDR's diagnoses include ADHD and "behavioral problems," and that RDR was prescribed Ritalin. Id. at p. 6 ("ADHD Form"). Dr. Haq indicated in a second form that RDR suffers from asthma for which Xopenex is prescribed. Id. at p. 7 ("Asthma Form").

Regarding the ADHD Form, while the form was generated after the ALJ rendered his decision, it fails to indicate clearly the *continuity and severity* of RDR's ADHD.  Considering next the Asthma Form, this form is not probative as it contains information already contained in the record.  Accordingly, these forms do not provide a basis for remand.

**B.    Listings**

A claimant is automatically entitled to benefits if his or her impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404. 20 C.F.R. § 404.1520(d) (the "Listings").  In this case, the ALJ found that RDR's conditions did not meet Listing 103.03 (Asthma), Listing 112.02 (Organic Mental Disorders), and Listing 112.11 (Attention Deficit Hyperactivity Disorder).  AT 19. The Court will examine each Listing in turn.

**1.    Listing 103.03 (Asthma)**

Listing 103.03, Asthma, requires the following:

Asthma.  With:
A. FEV1 equal to or less than the value specified in table I of 103.02A;

Or

B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks;

Or

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or

2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period;

12

Or

D. Growth impairment as described under the criteria in 100.00.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03.

In finding that RDR's condition fails to meet Listing 103.03, the ALJ pointed to the absence of test results satisfying the Listing and that RDR has not been hospitalized for treatment of this condition since 2002.  AT 19.  Indeed, the record lacks the pertinent test results and reflects that RDR visited the hospital on only two occasions in 2002.  AT 124-29.  During the first visit on January 1, 2002, RDR was diagnosed as suffering from a cold and an upper respiratory infection. AT 126-29.  During the second visit on January 27, 2002, RDR was diagnosed as suffering from a respiratory infection and reactive airways disease.  AT 124-25.  Moreover, on October 2, 2003, RDR's treating physician, Dr. Haq, described RDR's asthma as "stable."  AT 146.  In light of the foregoing, the ALJ's determination is supported by substantial evidence.

### 2.     Listing 112.02 (Organic Mental Disorders)

Listing 112.02 provides as follows:

112.02 Organic Mental Disorders: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain.  The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence of at least one of the following:
1. Developmental arrest, delay or regression; or
2. Disorientation to time and place; or
3. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

4. Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or

5. Disturbance in personality (e.g., apathy, hostility); or

6. Disturbance in mood (e.g., mania, depression); or

7. Emotional lability (e.g., sudden crying); or

8. Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or

9. Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or

10. Disturbance of concentration, attention, or judgment;

And

B. Select the appropriate age group to evaluate the severity of the impairment:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the following:

a. Gross or fine motor development at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings (see 112.00C); or

b. Cognitive/communicative function at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings of equivalent cognitive/communicative abnormality, such as the inability to use simple verbal or nonverbal behavior to communicate basic needs or concepts; or

c. Social function at a level generally acquired by children no more than one- half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings of an equivalent abnormality of social functioning, exemplified by serious inability to achieve age-appropriate autonomy as manifested by excessive clinging or extreme separation anxiety; or

d. Attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in two or more areas covered by a., b., or c., as measured by an appropriate standardized test or other appropriate medical

14

findings.

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02.

In finding that RDR's condition fails to meet § 112.02, the ALJ noted that RDR has developmental receptive and expressive language delays and motor skill delays for which he received occupational therapy, speech therapy, and special education services. AT 19.  The ALJ also noted that RDR was discharged from special education services in May of 2004 because he reached age-appropriate levels in all areas.  Id.  The ALJ then summarily concluded that RDR's delays do not meet or medically equal the requirements of § 112.02.

While Diane Slowick, a special education teacher, stated that RDR was discharged from Special Education Services on May 12, 2004 and that RDR "is functioning at his age level in all areas," AT 114, the record plainly indicates that RDR subsequently exhibited delays for which he is eligible for special services.  For instance, on June 7, 2004, Dr. Noia found some minor delays in

adaptive functioning and low average intelligence.  AT 200.  On December 8, 2004, Ms. O'Connor,

a speech/language therapist, found that RDR exhibits delays in receptive and expressive language

skills.  AT 232.  Ms. O'Connor also found that RDR has a decreased intelligibility in his speech.  Id.

A Preschool Student Evaluation Summary Report dated December 9, 2004 indicates that RDR's

cognitive skills are in the low average range; his socialization skills are an area of weakness; he has

fine motor delays, difficulty functioning in the classroom, and exhibits delays in receptive and

expressive language skills.  AT 213-15.  On December 9, 2004, RDR was evaluated by various

members of the Early Childhood Program of the Syracuse City School District.  AT 233-44.  It was

found, *inter alia*, that RDR's overall cognitive skills are in the low average range.  AT 242.  On

January 28, 2005, Dr. Hargrave diagnosed RDR as suffering from learning disabilities in speech and

sensory integration which are improved with intervention, and "mother/child interaction issues

exacerbated by mom's new pregnancy."  AT 247.  Finally, the February 18, 2005 IEP indicates that

RDR is eligible for special education services, occupational therapy, and speech/language services.

AT 211-12.  Accordingly, the ALJ's finding is not supported by substantial evidence.

### 3.   Listing 112.11 (Attention Deficit Hyperactivity Disorder)

Section 112.11 provides as follows:

112.11 Attention Deficit Hyperactivity Disorder: Manifested by developmentally
inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity for these disorders is met when the requirements in
both A and B are satisfied.

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

16

And

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11.

In finding that RDR's condition fails to meet § 112.11, the ALJ simply stated that RDR "does not exhibit the marked limitations in areas of hyperactivity, inattention, or impulsiveness required for that listing." AT 19. The Court finds that the ALJ failed to set forth a sufficient rationale supporting this conclusion. The Second Circuit instructs that in cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment. Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982); see also Hendricks v. Commissioner of Social Security, 452 F.Supp. 2d 194, 198-99 (W.D.N.Y. 2006). Based on the foregoing, the Court is unable to find that the ALJ's finding is supported by substantial evidence.

## C.   Functional Domains

The ALJ examined RDR's functional limitations with regard to the six domains set forth in 20 C.F.R. § 416.926a(b)(1). As noted, the ALJ found that RDR has a marked limitation in only one domain of functioning. AT 21. The Court will examine each domain in turn.

### 1.   Acquiring and Using Information

The domain of Acquiring and Using Information addresses how well a child learns information and uses the information he or she has learned. 20 C.F.R. § 416.926a(g). The ALJ found no limitations in this domain, noting that medical records showed functioning in the low average range of intellectual functioning and that RDR was discharged from special education. AT 20. However, as noted above, the record indicates that RDR subsequently exhibited delays in

17

various areas and the February 18, 2005 IEP indicates that RDR is eligible for special services.  AT 211-12.  Specifically, RDR is eligible for special education services, occupational therapy, and speech/language services.  Id.  Accordingly, the ALJ's finding in this regard is not supported by substantial evidence.

### 2.      Attending and Completing Tasks

The domain of Attending and Completing Tasks gauges how well a child is able to focus and maintain attention.  20 C.F.R. § 416.926a(h).  The ALJ found no limitations in this domain, noting that the "records do not document any significant limitations.  Only slight problems were noted by his teacher before discharge from special education."  AT 20.  However, as indicated, RDR subsequently exhibited delays in various areas and the February 18, 2005 IEP indicates that RDR is eligible for special services.  AT 211-12.  Specifically, RDR is eligible for special education services, occupational therapy, and speech/language services.  Id.  Accordingly, the ALJ's finding in this regard is not supported by substantial evidence.

### 3.      Interacting and Relating with Others

The domain of Interacting and Relating with Others considers how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  20 C.F.R. § 416.926a(i).  The ALJ found that RDR has marked limitations in this domain.  AT 21.  In making this determination, the ALJ noted, *inter alia*, that RDR "has made progress and is no longer receiving special education services.  His teacher rates him as age appropriate in all areas."  Id.  However, as noted, RDR subsequently exhibited delays in various areas and the February 18, 2005 IEP indicates that RDR is eligible for special services.  AT 211-12.  Specifically, RDR is eligible for special education services, occupational therapy, and

speech/language services.  Id.  Accordingly, the ALJ's finding in this regard is not supported by substantial evidence.

### 4.    Moving About and Manipulating Objects

The domain of Moving About and Manipulating Objects considers gross and fine motor skills, meaning how well the child moves his body from one place to another and how he moves and manipulates things.  20 C.F.R. § 416.926a(j).  In finding that RDR has no limitations in this domain, the ALJ noted that RDR's "motor skills have been delayed but he received occupational therapy. He has made progress and was rated by his teacher as age appropriate in this domain."  AT 21. However, as noted, RDR subsequently exhibited delays in various areas and the February 18, 2005 IEP indicates that RDR is eligible for special services.  AT 211-12.  Specifically, RDR is eligible for special education services, occupational therapy, and speech/language services.  Id.  Accordingly, the ALJ's finding in this regard is not supported by substantial evidence.

### 5.    Caring for Yourself

The domain of Caring for Yourself considers how well a child maintains a healthy emotional and physical state, including how well he has his physical and emotional needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he cares for his own health, possessions and living area.  20 C.F.R. § 416.926a(k).  In finding that RDR has no limitations in this domain, the ALJ noted that the evidence reflects that RDR is age appropriate in this domain.  AT 21.  However, as noted, RDR subsequently exhibited delays in various areas and the February 18, 2005 IEP indicates that RDR is eligible for special services.  AT 211-12. Specifically, RDR is eligible for special education services, occupational therapy, and speech/language services.  Id.  Accordingly, the ALJ's finding in this regard is not supported by substantial evidence.

**6.      Health and Physical Well-Being**

The domain of Health and Physical Well-Being considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on a child's functioning that were not considered in the domain of Moving About and Manipulating Objects.  20 C.F.R. § 416.926a(l).  The ALJ found that RDR has a "less than marked" limitation in this domain.  AT 22.  In making this determination, the ALJ noted that RDR has a "history of being hospitalized for reactive airway disease in 2002.  Since that time, his asthma is controlled with medication.  He does have attacks, when very physically active or when the seasons change."  Id.

While the ALJ discussed RDR's asthma, the ALJ failed to discuss all of the cumulative physical effects of RDR's remaining physical or mental impairments.  For instance, while the ALJ noted that Dr. Hargrave diagnosed RDR as suffering from "probable" obstructive sleep apnea which contributes to behavioral problems and cognitive problems, the ALJ failed to discuss this condition with regard to RDR's functioning.  See AT 21-22, 247.  Accordingly, the ALJ's determination in this regard is not supported by substantial evidence.  In light of the foregoing, the matter must be remanded for a reevaluation of the six domains.

**D.      Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  See 20 C.F.R. §§ 404.1529, 416.929; see also

Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence,
whether the medical impairments "could reasonably be expected to produce the pain or other
symptoms alleged."  20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence alone
establishes the existence of such impairments, then the ALJ need only evaluate the intensity,
persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits
the claimant's capacity to work.  Id. §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or
limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's
subjective complaints by considering the record in light of the following symptom-related factors:
(1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's
symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects
of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6)
any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning
claimant's functional limitations and restrictions due to symptoms.  Id. §§ 404.1529(c)(3),
416.929(c)(3).

With regard to RDR's credibility, the ALJ simply stated that RDR's "subjective complaints
are considered credible only to the extent they are supported by the evidence of record as
summarized in the text of this decision."  AT 22.  Social Security Ruling 96-7p requires that the
ALJ set forth a detailed statement of his assessment of the claimant's credibility, as follows:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the
> individual's allegations have been considered" or that "the allegations are (or are not)
> credible."  It is also not enough for the adjudicator simply to recite the factors that are
> described in the regulations for evaluating symptoms.  The determination or decision
> must contain specific reasons for the finding on credibility, supported by the
> evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2.  Here, the ALJ's conclusory statement fails to clarify the

weight given to RDR's statements and the reasons for that weight.  <u>See</u> SSR 96-7p.  Therefore, the

credibility determination is insufficient and remand is required for a reevaluation of RDR's

credibility.

## IV.     CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter

be **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g)[6] for

further proceedings consistent with the above; and it is further

**ORDERED** that the Clerk serve a copy of this order on all parties.

**IT IS SO ORDERED.**


DATED:      May 27, 2008
            Albany, New York

                                         Lawrence E. Kahn
                                         U.S. District Judge

---

[6] Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."  42 U.S.C. § 405(g).